Nat H. Hentel, J.
This is a summary holdover proceeding to recover possession of the first floor rear apartment at 28-03 34th Street, Astoria, which is a six-family dwelling. The matter was tried without a jury and the following facts were established at the trial:
1. The respondent tenant along with his wife and their children resided in the third floor rear apartment of the subject premises for 17 years from 1951 to 1968. During these 17 years all six apartments including the first and third floor rear apartments were subject to rent control. The respondent was paying $84.93 per month rent for apartment ‘ ‘ 3 rear ’ ’ in 1968. The respondent and his wife both knew that all of the apartments in their building were rent-controlled during these 17 years, and they always had a lease for their apartment during this period of time. The lease on “ 3 rear ” expired on June 30, 1967and no new lease was thereafter signed between petitioner and respondent until on or about November 1, 1968; and, in the interim, respondent continued to pay $84.93 per month rent on “3 rear.”
2. Petitioner landlord became the owner of the premises on May 28,1965, approximately in the 14th year of the respondent’s tenancy. Thereafter, and in or about May 1966, after the then long-term tenant of apartment ‘ ‘ 1 rear ’ ’ was evicted, one Konstantinos Mougias, moved into ‘ ‘ 1 rear ’ ’ with his wife and two children. Mr. Mougias, it turns out, had become half owner of the premises with the petitioner Vasilios Dimou after the latter had become the owner in 1965. Mr. Mougias did not pay rent. “ 1 rear ” was under rent control at the time he occupied the said apartment. The fact that Mr. Mougias was a co-owner was unknown and not revealed to the respondent or the other tenants according to the uncontroverted testimony of the respondent and his wife. Mr. Mougias then sold and transferred his half-share in the premises on June 20, 1968, and thereafter Vasilios Dimou, once again, and his wife Maria became the sole owners of the premises. Mr. Mougias still paid no rent on ll rear ” and then moved from that apartment on October 1, 1968. “ l rear ” is the exact same apartment as “ 3 rear ” until then occupied by the respondent.
*594 3. Conversations ensued between respondent and his wife and petitioner Yasilios Dimou with respect to the respondents moving from “3 rear ” to “ 1 rear ” which conversations began in June, 1968, and culminated in October, 1968. It was agreed between the parties that the respondent could have “ 1 rear” for the same rent as “ 3 rear ”, but, if respondent wanted a new stove, a new sink, and storm windows and screens, the rent for “ 1 rear ” would be $95 per month. A lease was entered into between Vasillos and Maria Dimou as landlords and the respondent as tenant for “ 1 rear ” commencing November 1, 1968, and expiring on October 31, 1970, at a monthly rent of $95. Mr. Dimou testified that he did not learn that “ 1 rear ” was not subject to rent control by virtue of previous owner occupancy until a month and a half or two months after the respondent moved into “ 1 rear ” on or about November 1, 1968; and further that ‘11 rear ’ ’ had never been listed with a real estate agent for renting during the period June to October, 1968. Mr. Dimou also testified that, at the time of the lease execution with respondent on November 1,1968, he ‘ ‘ knew the apartment (1 rear) was rent controlled.” The respondent testified that during the discussions with petitioner, the negotiations for the new lease, and the lease execution, there was no mention of whether or not “ 1 rear ” was decontrolled or whether it was petitioner’s intention to make application with the office of rent control for rent decontrol of “ 1 rear ”.
4. On January 23, 1969, some two and a half months after the lease for “ 1 rear ” had been entered into, Yasilios Dimou, one of the petitioners instituted a proceeding on notice to the respondent to decontrol the rent on “ 1 rear ” through the office of rent control “ by reason of the provisions of Section 2f (11) ” of the City Bent Eviction and Behabilitation Begulations; and stated therein that the ‘ ‘ evidence upon which the District Bent Director may rely ” is that the “ proposed decontrol is based on occupancy of owner for period in excess of one year.” Bespondent did not file an answer to this notice of commencement of proceeding because he states he did not understand the meaning of the notice, and that he called the office of rent control immediately after receiving the notice “ and was informed that my rent could not be raised nor could I be evicted during the duration of the lease.” Thereafter, an order decontrolling the rent on “ 1 rear ” was made and entered in the Queens rent office on February 4, 1969, some three months after the lease was executed. It is interesting to note that the name of the landlord on the said notice of commencement of proceeding^ and upon the order decontrolling rent is listed as “ Vasilios Dimou *595 and Konstantinos Mougias ”, rather than “ Vasilios Dimou and Maria Dimou ”, the landlords listed on the November 1, 1968 lease. And this, even though the petitioner Vasilios Dimou admitted at the trial that Mougias sold his share of the premises back to him and his wife on June 20,1968.
5. The respondent’s lease expired on October 31, 1970, and prior thereto, respondent continued to pay the stipulated rent of $95 per month. On November 5, 1970, respondent received a notice from the petitioners that the rent for ‘ ‘ 1 rear ’ ’ was raised from $95 per month to $180 per month as of January 1, 1971. Thereafter, by a “ thirty day notice to monthly tenant ’ ’ dated March 17,1971, the petitioners Vasilios and Maria Dimou notified respondent that they elected to terminate his tenancy as of April 30, 1971. Pending the outcome of this litigation, respondent continues to pay use and occupation at the rate of $95 per month by virtue of an order of the Appellate Term for the 11th Judicial District dated July 9, 1971.
It is clear from the evidence, that all apartments in respondent’s building were subject to rent control except “ 1 rear ” as of October 1, 1968, but this fact was unknown to respondent as of November 1,1968, the effective date of the lease for “ 8 rear ”, and the date of respondent’s removal from “ 3 rear ” to “ 1 rear ”.
The thrust of the affirmative defense contained in the respondent’s answer to the petition is that petitioner “fraudulently induced” respondent to switch from “3 rear” to “ 1 rear” by not revealing to him at the time that the “ 1 rear ” apartment was no longer subject to rent control. At the end of the trial, respondent further moved the court to allow him to amend his pleadings to conform to the proof and to include an affirmative defense to reform or set aside the said lease and its consequences to the respondent on the ground that it was entered into under a mutual or unilateral mistake of fact; and that the court in providing relief, put him in no worse position than he was prior to November 1, 1968. On this latter motion, the court reserved decision.
The issue for determination by this court simply put is: “ Did the petitioner properly achieve rent decontrol of apartment ‘ 1 rear ’ which would entitle him to double the rental for this apartment once the intervening lease expired on October 31, 1970! ”
As claimed by the petitioner, the governing portion of the New York City Rent, Eviction and Rehabilitation Regulations, section 2 (subd. f, par. [11]) provides: “Housing accommodations rented after April 1,1953, which were or are continuously *596 occupied by the owner thereof for a period of one year prior to the date of renting; [shall not be subject to control] provided, however, that this paragraph shall not apply: * * * for any housing accommodation in the same building. ”
During the trial, it was agreed by the parties that were the respondent’s wife called to the witness stand, she would testify to the same effect as set forth in her affidavit on file in this proceeding sworn to by her on June 3, 1971. In paragraph 15 thereof, she stated as follows: ‘ ‘ Mr. Mougias had little contact with me or the other tenants. He never collected rent. Mr. Dimou always personally collected the monthly rent. Only Mr. Dimou was personally introduced to me in 1965 by Mr. Gregory, the former owner, when ownership of the premises changed. Mr. Dimou requested that all problems and all complaints be referred to him at that time. That policy did not change when Mr. Mougias moved into the building. As indicated heretofore, the lease relied upon by the petitioner does not contain the name of Constantinos Mougias, although the subsequent notice from the office of rent control indicates that he was a landlord as of the date the lease agreement was executed.” These allegations were not controverted by Mr. Dimou, the only witness who testified on behalf of the petitioner, at the trial.
Thus, no proof was offered by the petitioner, upon whom the burden falls to establish decontrol by virtue of 11 good faith ” owner-occupancy, that (a) any tenant knew Mr. Mougias was a co-owner prior to January 23,1969, when his name first appeared on the application to decontrol “ 1 rear”; or that (b) Mr. Mougias was introduced to any of the tenants and identified by Mr. Dimou as a co-owner; or that he collected rents from the tenants; or took complaints from them during the period May, 1966 to October, 1968, while he resided in “ 1 rear ”.
The testimony of Mr. Dimou further shows that he lived in another comparable building owned by him during this period of time where two other co-owners also occupied that building. Mr. Dimou was represented during his ownership of the respondent’s apartment building by the same firm of attorneys who now represent him in this proceeding. These attorneys handled the eviction proceedings of the tenant in “ 1 rear ”, who occupied that same apartment prior to Mr. Mougias’ occupancy.
These facts and the circumstances under which Mr. Mougias acquired co-owner’s status and then rid himself of same two years later stimulate the court’s imagination as to the innocence and 11 good faith ” of these maneuvers especially since there appeared to be no effort made to rent “ 1 rear ” to none other *597 than a long-time resident of the same building, and when that had been accomplished, to move without waste of time for a decontrolled status under the aforesaid section 2 (subd. f, par. [11]).
Mr. Dimou’s testimony that he first learned he could decontrol ‘11 rear ’ ’, because an owner occupied it for more than a year, some one and a half or two months after he leased the apartment to the respondent; and that he learned of this by reading about such possibility in the real estate section of a Greek newspaper, does not reconcile with his testimony under cross-examination that he is of Armenian descent, who can speak but not read Greek; and who “ does- not know when he became aware first that an owner occupied apartment becomes decontrolled.”
The court is troubled by the inclusion of Mr. Mougias’ name as a co-owner on the 1969 application to decontrol “ 1 rear ”. The court cannot help but ask “ Why? ” Was it to lend an aura of respectability and “ good faith ” to an otherwise contrived set-up of the respondent for the coup de grace of doubled rent since there was no other way to accomplish such ‘ ‘ consummation devoutly to be wished ”, in view of respondent’s long protected status as a statutory tenant. The court keeps emphasizing the phrase “ good faith ” because it appears so frequently throughout the city’s rent laws and regulations. It is the underlying philosophy upon which these laws and regulations are apparently based. Fair play is the keystone of these statutes.
It appears that the respondent got more than he bargained for when he switched his apartment within the same building. It is inconceivable to the court that the respondent would move from the third floor to the first floor, into a similar apartment, at the same rent, except for specified extras, thereby laying himself open to the possibility of doubled rent merely because it would be more convenient for himself and his wife to transport their baby carriage to their apartment as claimed by the petitioner. The respondent’s trial memorandum says it well: “ The convenience of a first floor apartment is minimal when weighed against the protection against termination of tenancy afforded a tenant in a rent controlled status.”
The court feels that the proceeding before the city’s office of rent control instituted in 1969 by the petitioner was irregular and improper since the petitioner falsified a crucial, material and substantial jurisdictional fact pertaining to the ownership of the premises. Respondent had a right to rely on his lease then in effect which identified his landlords as Vasilios and Maria Dimou and not Messrs. Dimou and Mougias. It is apparent that an order obtained upon the basis of a falsified or mis *598 represented fact is not a valid or enforceable order even though it was not protested by the respondent in due course. Respondent has the right to rely upon the regularity of administrative proceedings based upon laws predicated on “ good faith ”.
From these provocative facts, the court concludes that petitioner was less than candid and forthright in his dealings with the respondent leading to the execution of the alleged lease for ££ 1 rear.” As the trier of the facts, the court chooses to believe respondent’s version of how the switch to the first floor apartment was accomplished. Respondent’s wife testified that in June, 1968, she complained to the petitioner Vasilios Dimou about her stove in the “ 3 rear ” apartment. According to Mrs. Cusanelli, the petitioner then told her that ‘ ‘ 1 rear ’ ’ would become vacant in October, and he then suggested that respondent move down into ‘ ‘ 1 rear ’ ’ to save the wear and tear of dragging a baby carriage up two flights of stairs. This sudden solicitude upon his part for respondent’s wife’s comfort does not sit too well with the court since he had previously refused respondent permission to store the baby carriage in the basement when he first took over as owner of the building. Certainly! They could have this new apartment at the same rent, freshly painted, and with a new stove, sink, and storm windows for only $10 extra per month! But not once did petitioner inform the respondent or his wife that the tenant who was moving out of “ 1 rear ” was a co-owner and what the probable consequences could be for rent decontrol.
All of this adds up to something less than fair play and coming to court with clean hands. The concealment of Mr. Mougias ’ status as an owner; the lack of legal representation of the respondent during the new lease negotiations; the falsification of ownership on the rent decontrol application; petitioner’s equivocation in his testimony as to when he first became aware of the decontrol possibility for “ 1 rear ” — all spell out, in this court’s opinion, that petitioner caused the respondent to surrender his security as a rent-controlled tenant and thereby placed him in a position of jeopardy by virtue of fraud and misrepresentation or by virtue of a mistaken understanding of a critical fact.
Because of these circumstances, the court grants respondent’s motion to conform his pleadings to the proof and allows him to interpose an affirmative defense of 6 £ mistake of fact. ’ ’ Although it appears unlikely that the petitioner did not know of the decontrolled status of ££1 rear”, it is obvious that the respondent did not know, and could not have known this fact. Even, if the *599 court gives the petitioner the benefit of the doubt that there was a “ mutual mistake ” as to the decontrolled status of the apartment, nevertheless, the respondent would be afforded the relief he seeks in this proceeding. It is inconceivable that any tenant would exchange one apartment protected by rent control for an identical apartment unprotected by rent control.
It is not essential that affirmative false representations be made to establish misrepresentation or fraud. “ Concealment with intent to defraud of facts which one is duty-bound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations of fact.” (Nasaba Corp. v. Harfred Realty Corp., 287 N. Y. 290, 295).
This court has jurisdiction to entertain any legal or equitable defenses interposed in a summary proceeding. (Real Property Actions and Proceedings Law, § 743.) Equity will relieve against a mutual mistake of fact provided it is material and concerns an existing fact. (37 N. Y. Jur., Mistake, Accident and Surprise, §5.) Furthermore, a court having the power to perform equity has the power to rescind a contract (lease) which was induced by unilateral mistake to prevent the enforcement of an unjust agreement. (Rosenblum v. Manufacturers Trust Co., 270 N. Y. 79.)
Respondent’s mistake as to the rent control status of the apartment goes to the essence of the transaction. It determined the conduct of the mistaken party. (37 N. Y. Jur., supra, § 4.) Certainly, had the tenant known that, in entering into this transaction, he was acting to his detriment by accepting premises not equivalent to those being relinquished, controlled as 'opposed to decontrolled, his conduct would have been different. The fact of decontrol was so materially variant from the respondent’s understanding that the transaction must fail for lack of any meeting of the minds. (Dunn v. Dunn, 151 App. Div. 800.) And, even if there was mutual mistake about the decontrolled status, the court will not permit the petitioner to take advantage of such mistake and profit thereby.
Parenthetically, it seems to the court that section 2 (subd. f, par. [11]) of the city rent regulations, under which the petitioner relied and allegedly accomplished his decontrol of apartment “ 1 rear ”, actually worked in favor of the respondent’s position on a “ strict construction of statute ” principle. It appears that this section is inapplicable as the basis for granting the relief desired by the petitioner. This section requires the owner to occupy the accommodation continuously for a period of one year prior to the date of renting. Here, the co-owner Mougias moved out of the apartment on October 1, 1968, and the lease to *600 the respondent became effective on November 1, 1968. Thus, there was an hiatus of one month. There was no continuous occupation of this apartment then for one year prior to the new renting. Then again, even if this were not so, this section apparently would not apply inasmuch as the accommodation in question was in the same building as the tenant’s prion1 and relinquished accommodation. (See wording of statute, supra.)
Accordingly, the petition is dismissed and judgment is rendered in favor of the respondent. He may continue to occupy apartment “ 1 rear ” as if it were rent controlled, and as if he had never moved from his former “ 3 rear ” apartment. His present occupancy and status shall continue as a statutory tenant fully protected by a rent-controlled apartment.